JUDGE BATTS

08 CV 6997

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DRAMA FAMILY ENTERTAINMENT, INC.,

                    Plaintiff,

        -against-

MARY J. BLIGE, INTERSCOPE GEFFEN A & M
RECORDS, A DIVISION OF UMG RECORDINGS,
INC., AND THERON FEEMSTER p/k/a "NEFF-U",

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.

**COMPLAINT**

Plaintiff Demands
A Trial By [Jury]

RECEIVED
AUG 0 5 2008
U.S.D.C. S.D. N.Y.
CASHIERS

       Plaintiff Drama Family Entertainment, Inc., by its attorneys Caplan & Ross, LLP, for its Complaint against the Defendants herein, alleges as follows:

## SUMMARY OF ACTION

    1.    This action is brought by Plaintiff (i) against all Defendants for copyright infringement of a sound recording entitled "Pull 1 Rough" by reason of the creation, release and commercial exploitation of a recording entitled "Work That," as performed by Mary J. Blige, and (ii) to recover monies loaned by Plaintiff to Defendant Theron Feemster and not repaid despite due demand.

## THE PARTIES

    2.    Plaintiff Drama Family Entertainment, Inc. ("Drama Family" or Plaintiff") is a New York corporation with its principal place of business located at 9135A Reseda Blvd., Suite 117, Northridge, CA 91324.  Drama Family is the successor-in-interest to Drama Entertainment, Inc.

3.      Upon information and belief, Defendant Mary J. Blige ("Blige") is a citizen and resident of the State of New York.  Blige is a recording artist and musician who transacts business in the City, County and State of New York.

4.      Upon information and belief, Defendant Interscope Geffen A & M Records ("Geffen") is a division of UMG Recordings, Inc., a Delaware corporation with a place of business in New York and which regularly and systematically transacts business in the State of New York.  Upon information and belief, at all relevant times, Geffen was and continues to be engaged in the business of producing, manufacturing, distributing, selling and otherwise commercially exploiting recorded versions of music performances.

5.      Upon information and belief, Defendant Theron Feemster p/k/a "Neff-U" ("Feemster") is a citizen and resident of the State of California.  At all relevant times, Feemster was a hip hop producer and musician who transacts business in the City, County and State of New York.  (Geffen, Blige, and Feemster are sometimes hereinafter collectively referred to as "Defendants.")

## JURISDICTION AND VENUE

6.      This action arises under the Copyright Act of 1976, 17 U.S.C. § 101 et seq. (the "Copyright Act").  This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court also has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

7.      The venue of this action is properly laid in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400 in that a substantial part of the events giving rise to the claims herein occurred in the Southern District of New York and at the time of the

commencement of this action, Defendants are subject to personal jurisdiction in the Southern District of New York.

## BACKGROUND

### The Work for Hire Agreement

8.    On or around January 14, 2002, Plaintiff entered into an agreement with Feemster (the "Work for Hire Agreement"), whereby Plaintiff employed Feemster to provide services as a producer, arranger, musician and remixer of master recordings.  A copy of the Work for Hire Agreement is annexed hereto as Exhibit 1.

9.    Pursuant to the Work for Hire Agreement, Feemster was deemed an employee for hire and any master recordings created under the Work for Hire Agreement were deemed "works made for hire" under § 201(b) of the 1976 Copyright Act, and authored and owned by Plaintiff.

10.    On or about January 10, 2006, during the term of the Work for Hire Agreement, Feemster composed, produced, and recorded the composition "Pull 1 Rough" (the "Sound Recording") and delivered the Sound Recording to Plaintiff.

11.    Plaintiff is the sole proprietor of all rights, title and interest in and to the copyright in the Sound Recording.

12.    Plaintiff, as the owner of the Sound Recording, has the exclusive rights to do or authorize any of the following:

- To manufacture the Sound Recording
- To reproduce the Sound Recording
- To distribute the Sound Recording
- To prepare derivative works based on the Sound Recording
- To perform the Sound Recording publicly by means of a digital audio transmission.

3

13.    Plaintiff duly filed a copyright registration in the Sound Recording with the U.S. Copyright Office, Registration No. SRu 871-387 with an effective date of June 25, 2008. A true and correct copy of the copyright registration certificate is annexed hereto as Exhibit 2.

14.    The copyright in the Sound Recording is currently valid and subsisting.

15.    At all times prior to the commencement of this action, Plaintiff, in respect of the Sound Recording, has fully complied with the statutory formalities governing copyrights.

16.    Plaintiff has not executed any agreement transferring ownership of, or licensing its copyright in, the Sound Recording to any of the Defendants.

**The Growing Pains Album**

17.    Upon information and belief, on or about December 18, 2007, Defendants placed in the international marketplace, including the City, County, and State of New York, phonorecords, compact discs, audio-visual works and digital audio transmissions of Defendant Mary J. Blige's eighth studio album, entitled "Growing Pains," on the Geffen record label (the "Infringing Album").

18.    The Infringing Album embodies an unauthorized copy and/or derivative work of the Sound Recording embodied in the opening track thereof, entitled "Work That" (the "Infringing Recording").

19.    Upon information and belief, Feemster provided a copy of the Sound Recording to Blige and Geffen prior to the creation of the Infringing Recording and Album.

20.    The Infringing Recording and Album were produced, manufactured, reproduced, distributed, sold, and released by Defendants on the Geffen record label, and sales of the Infringing Recording and Album have taken place within this judicial district.

4

21.     Blige is credited on the cover of the Infringing Album as Executive Producer of the Infringing Album and, upon information and belief, participated in and contributed to the creation of the Infringing Recording and Album.

22.     Feemster is credited in the liner notes of the Infringing Album as producer of the Infringing Recording and, upon information and belief, participated in and contributed to its creation.

23.     Defendants have infringed and continue to infringe Plaintiff's copyright in the Sound Recording by producing, manufacturing, reproducing, distributing, selling, promoting, advertising, performing by means of digital audio transmission, and otherwise commercially exploiting the Infringing Recording and Album, and/or authorizing others to do the same, without Plaintiff's authority or consent, in violation of 17 U.S.C. § 106.

24.     Geffen's exploitation of the Sound Recording includes, but is not limited to, the release and sale of the Infringing Album and the Infringing Recording as a "single" and the licensing of the Infringing Recording for use in an Apple iPod commercial.

25.     On December 4, 2007, prior to the release of the Album, Plaintiff's counsel sent a demand letter to Geffen advising Geffen of its copyright ownership in the Sound Recording and demanded that Geffen cease and desist its exploitation of the Sound Recording. A copy of the demand letter is attached hereto as Exhibit 3.

26.     On December 4, 2007, Defendant Geffen sent a non-substantive response letter to Plaintiff's counsel and forwarded Plaintiff's demand letter to Mary J. Blige, c/o Sonya Guardo. A copy of the response letter is annexed hereto as Exhibit 4.

27.    Upon information and belief, to date, Defendants have not responded to Plaintiff's demand letter in any substantive manner, and have continued to infringe Plaintiff's copyrights in the Sound Recording.

28.    Defendants' actions with respect to the release and commercial exploitation of the Infringing Recording and Album are wrongful and willful.

## AS AND FOR A
## FIRST CLAIM FOR RELIEF
### (Copyright Infringement)

29.    Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "28" as if fully set forth herein.

30.    All of Defendants' acts were performed without the permission, license or consent of Plaintiff.

31.    By reason of the foregoing, Defendants have infringed Plaintiff's copyrights in the Sound Recording.

32.    Defendants' infringements are willful and intentional inasmuch as Defendants were or should have been aware, and had reason to believe, that their acts constituted infringements of Plaintiff's copyright.

33.    As a result of the willful and intentional conduct hereinabove set forth, Plaintiff is entitled to a permanent injunction prohibiting any further manufacture, sale, distribution, electronic transmission or other commercial exploitation of the Infringing Recording or any other work which infringes upon the Sound Recording.

34.    By reason of the foregoing, Plaintiff has been damaged in an amount, to be determined by this Court at a trial of this action, of no less than two million ($2,000,000) dollars.

6

35.    Plaintiff has suffered and will continue to suffer irreparable harm and injury as a result of the aforesaid infringing acts of Defendants.

36.    Plaintiff is without an adequate remedy at law.

## AS AND FOR A
## SECOND CLAIM FOR RELIEF AGAINST FEEMSTER
### (Breach of Contract)

37.    Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "36" as if fully set forth herein.

38.    In or about September 2001, Plaintiff and Feemster entered into a loan agreement (the "Loan Agreement,") at Feemster's behest, whereby monies would be loaned by Plaintiff to Feemster directly, and Plaintiff would make payments to third parties on Feemster's behalf, and Feemster agreed to repay all such monies plus interest upon demand for the same.

39.    Pursuant to the Loan Agreement, from September 2001 to October 2006, Plaintiff loaned monies directly to Feemster, and made payments on Feemster's behalf.

40.    As of October 12, 2006, the principal amount of the loans and payments made by Plaintiff to Feemster, or on Feemster's behalf, totaled $366,976.00.

41.    Despite due demand for the repayment of the loan balance, Feemster has failed to pay the same.

42.    By reason of the foregoing, Feemster has breached the Loan Agreement and Plaintiff has been damaged in a sum of no less than $366,976.00, plus interest.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     On the First Claim: (i) that Defendants, their officers, agents and employees and all persons acting in concert or participation with them be enjoined both during the pendency of this action and permanently thereafter from copying, reproducing, distributing or otherwise infringing Plaintiff's copyright in any manner, and from permitting, authorizing or causing others to do so; (ii) that Defendants, jointly and severally, be required to pay Plaintiff such damages as Plaintiff has sustained in consequence of Defendants' infringements of said copyright, and to account for and pay to Plaintiff all gains, profits and advantages derived by Defendants from their infringements of Plaintiff's copyright, the total amount to be determined by the Court at a trial of this action, but in no event less than two million ($2,000,000) dollars, or such damages as to the Court shall appear proper within the provisions of the copyright statutes; and (iii) that Defendants be required to deliver up to be impounded during the pendency of this action all infringing phonorecords and other infringing material in their possession and/or under their control and to deliver up for destruction all infringing copies and all plates, molds, and other machines for making such infringing copies;

B.     On the Second Claim for Relief against Feemster, awarding Plaintiff damages in a sum, to be proved at trial, of not less than $366,976.00, plus interest;

C.     Awarding Plaintiff its costs and disbursements incurred in prosecuting this action; and

      D.      Granting Plaintiff such other and further relief as the Court deems just and

proper.

Dated:      New York, New York
              August 5, 2008

                      CAPLAN & ROSS, LLP

                      By:_____
                            Brian D. Caplan
                            Jonathan J. Ross
                      Attorneys for Plaintiff
                      100 Park Avenue, 18th Floor
                      New York, New York  10017
                      (212) 973-2376

Exhibit 1

FURNISHING AGREEMENT

THIS AGREEMENT, made and entered into this __ day of January, 2002 by and between Drama Entertainment, Inc., c/o Felcher & Freifeld, LLP, 358 Fifth Avenue, Suite 401, New York, NY 10001 (hereinafter referred to as the Company") and Theron Beemster, c/o _____ _____ (hereinafter referred to as "Producer").

W I T N E S S E T H :

In consideration of the mutual covenants herein contained, the parties hereto have agreed and do agree as follows:

1.       Company hereby engages Producer for Producer's exclusive services in the entertainment field during the Term (as defined herein), relating to those as a producer, arranger, musician and/or remixer of master recordings, including but not limited to demonstration recordings, as that term is defined hereunder and in the music industry (hereinafter "Producer Services").

2.       Company shall have the exclusive right to receive fees or other compensation for the services to be rendered by Producer, and Producer does hereby expressly waive any claim whatsoever to such fees or other compensation, except as herein expressly set forth.

3.       (a)       For and in consideration of the full performance by the Producer of all of the Producer's obligations hereunder and except as additional compensation as provided for in paragraphs 15 & 17 of this Agreement with respect to Producer's interest in the underlying compositions hereunder (ie. Mechanical Royalties and Co-Publishing), Company shall pay to the Producer and the Producer agrees to accept an amount equal to fifty (50%) percent of any and all producer fees, (exclusive of actual, bona-fide and documented studio costs, recording costs and third party payments), and fifty (50%) percent of any and all producer royalties paid pursuant to agreements entered into by Company for Producer's services, which amounts shall be paid to Producer as same are received by Company.  It is hereby acknowledged and agreed that Producer's services as provided hereunder shall be furnished exclusively by Company during the Term hereof.

(b)       Solely for purposes of compliance with the U.S. and State Tax Code and Regulations, Producer understands and agrees that he is deemed to be an independent contractor, and in that regard, Company shall not be responsible for withholding any taxes from any compensation paid by Company to Producer hereunder, responsibility for which rests solely with Producer.

4.       (a)       The term of this Agreement (the "Term") shall consist of an initial period of two (2) years commencing on the date hereof (the "First Contract Period") plus the additional Contract Periods, if any, by which the Term may be extended by Company's exercise of one or more of the options granted to Company below.

(b)       Producer hereby irrevocably grants to Company two (2) separate options to extend the Term for a Second and Third Contract Period: and each such Contract Periods shall consist of a period of one (1) year.  Such option shall be deemed to be exercised by Company unless it shall give you written notice to the contrary at any time prior to the date that the then current Contract Period would otherwise expire.

5.       Company shall be under no obligation to furnish the services of Producer but will utilize its reasonable efforts to procure engagements for Producer's services.  Company's sole obligation hereunder shall be to make the payments required to be made to Producer.

6.       Producer represents and warrants that there are no prior contractual arrangements or

commitments which may or can interfere or conflict with any of the provisions of this Agreement or Producer's obligations or duties hereunder and that Producer will not enter into such contracts or commitments during the term of this Agreement.

7.    (a)    Company acknowledges and agrees that the services to be rendered by Producer are special, unique, unusual, extraordinary and of an artistic character, giving them a peculiar value, the loss of which cannot be reasonably compensated for in damages in an action of law and are impossible of replacement and that in the event of any breach of the provisions of this Agreement, Company will be caused irreparable damage, and that, therefore, Company shall be entitled as a matter of right to the enforcement of this Agreement and all of its provisions by injunction or other equitable relief in addition to any other rights or remedies that Company may have to damages or otherwise.

(b)    Producer acknowledges that Company's services are not exclusive to Producer and that Company shall be permitted to perform the same or similar services for other producers during the Term.  Company shall be permitted to devote such time and efforts to other business activities as Company may deem necessary or desirable, in Company's sole discretion.

8.    Producer hereby grants to Company the right to use the names, both legal and professional, likenesses or other identifications and biographical material concerning Producer, for purposes of trade and otherwise without restriction in connection with the Master Recordings hereunder, the phonograph records derived therefrom and Company's business and products; and Company agrees that, notwithstanding anything to the contrary contained herein, any likeness or biographical material concerning Producer used hereunder shall be subject to Producer's approval; provided that such approval shall be deemed given with respect to any such material submitted by Producer; provided, further, that such approval shall be deemed given with respect to any such material which Producer does not disapprove in writing within five (5) business days after Producer has been notified that such material is available for review at Company's offices.  Company's inadvertent failure to comply with the foregoing requirements with respect to likenesses and biographical material shall not be deemed to be a breach hereof; provided, that, after Company's receipt of notice from Producer of any such failure, Company shall use best efforts to prospectively comply with the foregoing provisions with respect to likenesses and biographical material.

9.    Producer agrees that he will promptly and faithfully comply with all of Company's reasonable rules and regulations, and that he will furnish and perform services and comply with the agreements hereunder conscientiously and to the full limit of his talents and capabilities, at all times during the term hereof (and otherwise as provided herein), and wherever required by Company and in accordance with Company's instructions and directions in all matters, including those involving artistic taste and judgment.

10.    Producer agrees to be available at all times at any place or places Company may designate from time to time unless excused in writing by Company, it being expressly agreed that Producer's services shall be rendered in any country to such extent as may be required by Company.  Should the Producer be required to perform any services at any place outside of his principal residence, or beyond a radius of one hundred (100) miles thereof, then Company agrees to reimburse Producer for Producer's reasonable living expenses away from his principal residence, and to furnish round trip transportation for the Producer to the location at which Producer renders services.  In the event that any payments made to Producer by Company for expenses hereunder, or for any expenses whatsoever, are subsequently disallowed by the taxing authorities of the federal government or any state, then promptly upon such disallowance, Producer agrees to reimburse Company the amount of any payments so disallowed.

11.    During the entire term of this Agreement, Producer warrants that he will remain or become and remain a member in good standing of the properly designated labor organization or

2

organizations representing persons performing services of the type and character required to be performed by him hereunder.

12.    Producer agrees that the Company may at any time or times, in its own or in the Producer's name, but at its own expense and for its own benefit, apply for and take out life, health, accident or other insurance covering the Producer, in any amount which the Company may deem necessary to protect its interests hereunder. The Company shall own all rights in such policies and the cash values and proceeds thereof and the Producer shall have no right, title or interest therein or with respect thereto. Producer agrees to assist in procuring such insurance by submitting to the customary examinations and by correctly preparing, signing and delivering such applications and other documents as may reasonably be required.

13.    All notices required to be given herein shall be delivered personally or shall be given by registered or certified mail and sent to the present address of the parties or to such other addresses as may be designated in writing by registered or certified mail by any party hereto.

14.    Each Master produced hereunder shall, from the inception of its creation, be considered a "work made for hire" for Company within the meaning of the U.S. Copyright Law. If it is determined that a master does not so qualify, then such Master, together with all rights in it (including the sound recording copyright), shall be deemed transferred to Company by this Agreement. All such Masters shall, from the inception of their creation, be entirely the property of Company in perpetuity, throughout the world, free of any claim whatsoever by Producer or by any persons deriving any rights or interests therefrom. If the Master delivered hereunder or any part thereof shall every be determined not to be a work made for hire, Producer hereby assigns to Company, throughout the universe in perpetuity, all right, title and interest (including without limitation the copyright therein and all extensions and renewals thereof and any trademarks relating thereto) in and to the Masters produced herein. Without limiting its rights, Company shall have the sole and exclusive right in perpetuity and throughout the world:

   (a)    To manufacture, advertise, sell, license or otherwise dispose of the Masters and phonograph records derived therefrom upon such terms, and under such trademarks, as Company elects, or, in its sole discretion, to refrain therefrom;

   (b)    To perform the Masters publicly and to permit the public performance thereof by any method now or hereafter known; and

   (c)    To use and publish Producer's name (including all professional, group and assumed or fictitious names), approved photographs and approved biographical material in connection with the promotion, exploitation and sale of derivatives of the Masters. Company will make available to Producer for approval, at its offices, any pictures, of Producer or biographical material about Producer which it proposes to use as set forth in the previous sentence. In the event Producer does not disapprove of the use of said pictures or biographical material within five (5) days after notifying Producer of such intended use, it will be deemed that such pictures or biographical material have been so approved. This paragraph will not apply to any material previously approved by Producer. No inadvertent failure to comply with this paragraph will constitute a breach of this agreement so long as Company uses its best efforts to cure said failure prospectively.

15.    Controlled Compositions. (a) All musical compositions contained on any Masters recorded pursuant to this Agreement, which are written or composed by Producer, in whole or in part, alone or in collaboration with others, or which are owned or controlled, in whole or in part, directly or indirectly, by Producer (hereinafter referred to as "Controlled Compositions") are hereby licensed to Company, its distributors or its licensees for the United States and Canada at the applicable royalty rates set forth below

3

per selection on the basis of records sold, less returns and credits, except that no publishing royalties shall be payable in respect of any records for which no royalties are payable pursuant to paragraph 7 hereof:

(i)    Seventy-five (75%) Percent of the minimum statutory rate for each controlled composition prevailing at the time of delivery of the masters herein.

(ii)    Any assignment made of the ownership of copyrights in, or the rights to license or administer the use of any controlled compositions, shall be subject to the terms and provisions hereof.

(iii)    No copyright royalties shall be payable in respect of Controlled Compositions which are arrangements of selections in the public domain.

(iv)    The "statutory rate" referred to in this paragraph 15 and any sub-paragraph hereof shall be the applicable statutory rate that exists on the date that the Third Party Master Recordings to which said statutory rate is to apply are delivered to, and accepted by Company, or any licensee, distributor, or foreign distributor of Company.

(v)    The total mechanical royalty for all compositions on any album including controlled compositions, will be limited to ten times the amount which would be payable under Article 19(a). For a record containing only one controlled composition, the total mechanical royalty on any Single will be limited to twice the amount under Article 15(a). The total mechanical royalty on any record which is not an album or a single will be limited to three (3) times the amount under Article 15(a).

(vi)    Company is hereby granted a royalty-free license to reproduce the composition recorded hereunder in synchronization with and in time relation to visual images featuring Producer's performances in so-called "video programs".

(b)    Producer agrees, upon Company's request, to cause to be issued to Company mechanical licenses for all selections recorded in any Third Party Masters hereunder which are not Controlled Compositions. Such mechanical licenses as Producer shall cause to be issued to Company shall be at rates and upon terms no less favorable to Company than those contained in the then current standard mechanical license issued by the Harry Fox Agency, Inc., or any successor to the Harry Fox Agency, Inc. that provides substantially similar services.

16.    Credit.

Company shall use best efforts to accord Producer an appropriate credit on labels of records and the liner notes of albums including inlay cards of cassettes and CD's derived from the Masters produced hereunder as follows: *"Produced by Theron Feemster for Drama Entertainment, Inc. "*, or such other credit as you and Company shall agree upon. Company shall use its best efforts to accord Producer proper credit in all national trade advertisements of 1/2 page or more and billboard strips where similar credit is accorded to other Producers of the a particular album or if the master is an A-side single. Company's inadvertent failure to comply with the foregoing shall not be deemed to be a breach of this Agreement provided such failure is cured prospectively.

17.    Publishing.    (a)    Producer hereby irrevocably and absolutely assigns, conveys and sets over to Company an undivided fifty (50%) percent interest in the worldwide copyright (and all renewals and extensions thereof) and all other rights in and to each musical composition written, owned or controlled, in whole or in part by Producer during the Term hereof (a "Published Composition").

4

(b)    Company shall be the exclusive administrator of all rights in and to each such Published Composition, and it shall be entitled to exercise any and all rights with respect to the control, exploitation and administration of the Published Composition, including without limitation, the sole right to grant licenses, collect all income and to use the name, likeness and biographical material of each composer, lyricist and songwriter hereunder in connection with each applicable Published Composition for the full term of copyright (including all renewals and extensions thereof) in and to each Published Composition; and

(c)    Producer represents and warrants that the Published Compositions are original and do not infringe upon or violate the rights of any other person and that Producer has the full and unencumbered right, power and authority to grant to Company all of the rights herein granted to Company.    Producer hereby indemnifies Company against any loss, damage or expense (including reasonable attorney's fees) in respect of any claims, demands, liens or encumbrances.    Company shall have the benefit of all warranties and representations given by the writers of the Published Compositions.

(d)    From all royalties earned and received by Company in the Untied States of America from the exploitation of the Published Compositions throughout the world (the "Gross Receipts"), Company shall:

(i)    deduct and retain all out-of-pocket costs incurred by Company in connection with the exploitation, administration and protection of the Controlled Compositions (plus a ten (10%) percent administration fee); and

(ii)    deduct and pay royalties payable to the writers of the Published Compositions (which Producer warrant and represent shall not exceed fifty (50%) percent of the Gross Receipts).  In addition, the royalties payable to the writers of the Published Compositions pursuant to this subparagraph shall not include any portion of public performance income received by Company from any performing rights society which pays writers, authors or composers the writer's share of such income directly).

(e)    Accountings for such royalties shall be rendered semi-annually within ninety (90) days after which Company receives its accounting from the Artist or Record Company as the case may be.

(f)    Any assignment made of the ownership or copyright in, or right to license the use of, any Published Compositions referred to in this paragraph shall be made subject to the provisions hereof.  The provisions of this paragraph are accepted by Producer, on Producer's own behalf and on behalf of any other owner of any Published Compositions or any rights therein.

(g)    Producer shall promptly provide Company with a copy of the songwriter agreement with the writer of each Published Composition or such other agreement evidencing Producer's rights in and to such Published Composition, and Producer shall provide Company with copies of such agreements with respect to Published Compositions not yet created promptly after their creation.

(h)    Producer shall execute and deliver to Company any documents (including without limitation, assignment of copyright) which Company may require to vest in Company and/or its designees, the copyright and other rights herein granted to Company in respect of each Published Composition.  If Producer shall fail to promptly execute such document, Producer hereby irrevocably grants to Company a power of attorney to execute such document in Producer's name.

18.    <u>Producer Warranties and Representations</u>.    Producer warrants and represents the following:

5

(a)     Producer is free to enter into and perform this Agreement with Company, is not and will not be under any disability, restriction or prohibition, contractual or otherwise, with respect to (i) Producer's right to execute this Agreement, (ii) Producer's right to grant all of the rights granted to Company hereunder, and (iii) Producer's right to fully perform each and every term and provision hereof. Producer agrees not to do or attempt to do, or suffer to be done, during or after the term hereof, any act in derogation of or inconsistent with Company's rights hereunder.

(b)     None of the masters produced hereunder nor any of the contents thereof, nor the manufacture or sale of records made from such masters, nor any other exploitation or use thereof, and no materials, ideas or other properties furnished by Producer and embodied or contained in or used in connection with the masters or the packaging or advertising for phonograph records hereunder, shall violate any law or infringe upon any common law or statutory rights of any party, including without limitation, contractual rights, copyrights and rights of privacy.  Without limiting the generality of the foregoing, Producer specifically represents and warrants that no selections recorded or to be recorded hereunder are subject to any re-recording restriction under any previous recording contract to which Producer may have been a party.  Producer and any person rendering services in connection with masters recorded hereunder is or will be a party to any contract which would in any way impair the rights granted Company hereunder.

(c)     Each master delivered hereunder shall be free of all liens and encumbrances, and there shall be no claims, demands or actions of any nature pending, threatened in writing or known to Producer with respect thereto which are not released prior to the delivery of the master involved.

(d)     All the masters produced pursuant to this Agreement shall be produced under and in conformity with any union agreements to which the masters may at any time be or become subject.

(e)     Producer has the right to use his/her professional name, and grants to Company the right to use and allow others to use said name in connection with records subject hereto.  Company's use of such name in accordance with the terms hereof will not infringe upon the rights of any third party.

(f)     Company shall not be required to make any payments of any nature for or in connection with the acquisition, exercise or exploitation of any rights granted to Company hereunder, except as specifically provided in this Agreement. Producer will pay all royalties or other compensation (whether in lieu of royalties or otherwise) becoming due to any persons who perform or in any way contributed to the recording and/or production of the masters delivered hereunder (other than Artist, other producers engaged by Company, or other persons engaged by Company).

(g)     It is understood and agreed that Producer shall notify Company, as soon as possible, of all portion(s) of master recordings and/or musical compositions (hereinafter, "samples") which Producer proposes to be embodied on or interpolated in any master, including all parties controlling rights in and to such master recordings and/or musical compositions.  As between Company and Producer, it is acknowledged that Producer shall be liable for any and all expenses incurred in connection with samples.  Furthermore, in the event there exists a royalty or other continuing obligation to third parties with respect to the underlying composition incurred by virtue of samples hereunder, or in the event third parties otherwise own an interest in the copyright of the underlying composition in connection with any masters recorded hereunder by virtue of the incorporation of a sample therein, such continuing obligations, royalty or ownership interest shall be borne solely by Producer.

(h)     All of Producer's representations and warranties shall be true and correct upon execution hereof and shall remain in effect for so long as Company, its licensees, assignees, transferees or successors in interest have any rights in or to any of the masters.

6

19.   Indemnification:       Producer agrees to and does hereby indemnify, save, and hold Company harmless from any and all damages, liabilities, costs losses and expenses (including legal costs and reasonable attorneys' fees) arising out of or connected with any claim, demand, or actions by a third party which is inconsistent with any of the warranties, representations, or covenants made by Producer in this contract.   Producer agrees to reimburse Company, or demand, for any payment made by Company at any time with respect to any such damage, liability, cost, loss or expense to which the foregoing indemnity applies, and which results in a final judgment or which is settled with the prior written consent of Producer (not to be unreasonably withheld or delayed).   Company shall notify Producer of any claim, demand, or action promptly after Company has been formally advised thereof.   Pending the determination of any such claim, demand, or action, Company shall have the right, at Company's election, to withhold payment of any monies otherwise payable to Producer hereunder, in an amount reasonably related thereto; provided, that Company shall not do so if and to the extent that Producer provides Company with a commercial surety bond satisfactory to Company and any amount so withheld shall be released if any action is not commenced with six (6) months following such withholding.

20.   Definitions.

For purposes of this Agreement:

(a)     The terms "deliver" or "delivered" shall mean Company's receipt and written acceptance of newly-recorded fully mixed, leadered, sequenced and equalized stereophonic master tapes commercially and technically satisfactory to Company, in proper form for the production of the parts necessary to manufacture records of first-class quality therefrom together with a reference disc therefor and all licenses, consents, approvals, label and jacket copy information, credits and other material required by Company to release records embodying such masters.   Producer shall also deliver all original session tapes and any derivatives, duplicates or reproductions thereof to Company at a location designated by Company.

(b)     The words "master recording" or "master" shall mean the equivalent of a seven (7) inch, 45 r.p.m. single-sided original recording of sound (whether or not coupled with a visual image and whether on magnetic recording tape, film, lacquer or acetate disc, or any other substance or material now known or unknown), which is intended for use in the production and manufacture of phonograph records. Company shall not be required to accept delivery of any master recording which is less than three (3) minutes in playing time.

(c)     The word "person" means any individual, corporation, partnership, association or other entity, or any other organized group of individuals or legal successors or representatives of the foregoing.

(d)     The term "Territory" means the universe.

(e)     "Album" means one or more 12-inch, 33-1/3 rpm, long-playing double-sided phonograph records of at least thirty-three (33) minutes in playing time, packaged as a single unit, or the equivalent thereof.

(f)     "Records", "phonograph records", "recordings" and "derivatives" mean all forms of reproductions, now or hereafter known, manufactured or sold primarily for home use, school use, juke box use or use on means of transportation, embodying sound alone or sound coupled with visual images.

(g)     "Composition" means a musical composition or medley consisting of words and/or music, whether in the form of instrumental and/or vocal music, contained on a Master.

7

(h)    "Recording Costs" means all costs incurred with respect to the production of master recordings embodying Artist's performances. Recording Costs include, without limitation, the cost of all instruments, musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc., payments to a trustee or fund based on wages to the extent required by any agreement between Company and any labor organization or trustee, all studio costs, tape, editing, mixing, mastering to tape, engineering, the costs of cutting reference discs, travel, per diems, production fees and/or advances, rehearsal halls, costs of non-studio facilities and equipment, dubbing, transportation of instruments and other costs and expenses incurred in producing such master recordings, from time to time, and which are customarily recognized as Recording Costs in the phonograph record industry.

21.    Notwithstanding anything to the contrary contained herein, it is agreed that:

(a)    Company may terminate this Agreement, at any time, by giving Producer written notice with respect thereto. Any such termination, as herein provided (or as otherwise provided in this Agreement), shall be subject to existing agreements entered into by Company, and Producer (not-withstanding such termination) agrees to be bound by such agreements insofar as they may affect him or relate to his services, and Producer agrees to render his services as and when required therein;

(b)    Producer shall not during the term hereof, render services for parties other than the Company unless same are approved in advance by Company, which approval can be withheld by Company in its reasonable discretion.

22.    This Agreement represents the entire understanding between the parties, all prior discussions, conversations and understandings being merged herein. This Agreement may not be modified orally. Producer acknowledges that he has had complete opportunity to have this document explained to him by an attorney of his own choosing.

23.    Producer agrees to execute such documents and do such other acts as may be reasonably required by Company to further evidence or effectuate the rights granted hereunder as well as all documents necessary for Company to comply with any producer agreement. Should Producer fail to deliver to Company any such further documents within a reasonable period of time (not to exceed ten (10) days in any event) after requested by Company, Producer hereby appoints Company as its attorney-in-fact, which power shall be irrevocable and coupled with an interest, to execute and deliver any such document in the name of Contractor.

24.    Producer further acknowledges that (i) in the event of any breach hereunder by Company, Producer will be limited to Producer's remedies at law for damages, if any, and will not have the right to terminate or rescind any rights in the work granted hereunder; (ii) nothing herein shall obligate Company to use the Master produced hereunder; (iii) Company shall have the right to direct and supervise the performance of Producer's services hereunder; and (iv) Producer is engaged hereunder as an independent contractor and nothing herein contained shall constitute Producer as Company's employee or agent.

25.    <u>Governing Law</u>. This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York. The New York courts (state and federal), only, will have jurisdiction of any controversies regarding this Agreement, any action or other proceeding which involves such a controversy will be brought in those courts, in New York county, and not elsewhere. Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail directed to the address first above written or such other address as you may designate. Pursuant to this Agreement, any such process may, among methods, be served upon the Producer by delivering the process or mailing it by registered or Certified Mail, directed to the address first above written or such

8

other address as the Producer or the other person concerned may designate in the manner prescribe in this Agreement. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York.

26.    <u>Assignment</u>.  This Agreement shall inure to the benefit of and be binding upon the successors, permitted assigns and representatives of the parties hereto.  Company may, at its election, and without notice to or approval by Producer, assign this Agreement or any of its right hereunder, without liability, provided that such assignee of Company agrees to be bound by all of the terms and conditions of this Agreement.  Producer shall not have the right to assign this agreement.

27.    <u>Legal Representation</u>. You represent to us that you have read this agreement and/or have had the legal effect of each of its provisions explained to you by a lawyer chosen by you familiar with the music entertainment industry.

IN WITNESS WHEREOF, the parties hereto have hereunto executed this Agreement as of the day of year first above written.

Drama Entertainment, Inc.

By: _____
      Authorized Agent

_____
Theron Beemster    IF
SS#:
D.O.B.: 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

9

Exhibit 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Registration Number:**

## SRu 871-387

**Effective date of
registration:**

June 25, 2008

## Title

Title of Work: PULL 1 ROUGH

## Completion/Publication

Year of Completion: 2006

## Author

■      Author: Drama Family Entertainment, Inc. as employer for hire of Theron Feemster

Author Created: Original Sound Recording

Citizen of: United States

Anonymous: No                              Pseudonymous: No

## Copyright claimant

Copyright Claimant: Drama Family Entertainment, Inc.

## Limitation of copyright claim

Previously registered: No

## Certification

Name: Brian D. Caplan

Date: June 17, 2008

Correspondence: Yes

Exhibit 3



**FELCHER & FREIFELD** LLP

December 4th, 2007

**VIA CERTIFIED MAIL & ELECTRONIC MAIL @ rand.hoffman@umusic.com**
Rand Hoffman, Esq.
Sr. Vice President – Business Affairs
Geffen Records
2220 Colorado Avenue
Santa Monica, CA 90404

      *Re:   Mary J. Blige/"Work That"*

Dear Rand:

      It has come to our attention that Geffen Records ("Geffen") is currently exploiting (including, but not limited to a national advertising campaign for iTunes) and plans to commercially release records throughout the world embodying the master recording entitled "*Work That*" (the "Master") featuring the performances of Geffen recording artist Mary J. Blige ("Artist").   Please be advised that our client, Drama Family Entertainment, Inc. ("Drama Family") owns and controls the Master and no binding contract and/or valid copyright transfer or work-for-hire documents have been executed by our client. Specifically, and as it may be verified without any semblance of doubt, the Master was composed and produced by Drama Family's producer Theron Feemster p/k/a "*Neff-U*" ("Producer") during the term of Producer's exclusive engagement by Drama Family.

      As such, you are hereby notified that Geffen and Universal's use of the Master and the underlying musical composition embodied therein has not been authorized or otherwise licensed by our client.  Furthermore, your unauthorized use of the Master constitutes willful infringement of our client's rights under inter alia applicable United States Federal Copyright laws.

      In light of the foregoing, we hereby demand that you cease and desist from any and all exploitation of such Master and immediately deliver to us all copies of the Master in your possession, as well as provide us with an accounting of all income received by you in connection with the Master.

      Should you continue to exploit the Master, or if the foregoing items are not delivered to our New York office within ten (10) days from the date of this letter, then our client shall immediately take all necessary legal action to protect his rights, which may include but is not limited to, seeking injunctive, punitive, and other legal and equitable relief without further notice.

SCOTT A. FELCHER    ✦
EVAN L. FREIFELD    ✱
DIANE KRAUSZ    ✛

✦ Member of New York and New Jersey Bars
✱ Member of New York, New Jersey and Florida Bars
✛ Of Counsel

NEW YORK / 358 Fifth Ave., #401 / New York, New York  10001 / Ph 212.695.7800 / Fx 212.695.4041
Long Island / 15 Remsen Ave. / Roslyn, New York  11576 / 516.484.4370
New Jersey / 343 Millburn Ave., #200/ Millburn, New Jersey  07041 / Ph 973.994.7100 / Fx 973.258.0388

Nothing contained in or omitted from this letter shall constitute a waiver or election of any of our client's rights or remedies at law or in equity.

Sincerely,

SCOTT A. FELCHER

SAF/sw
cc:    Charles Stanton
       Kenneth Meiselas (via certified mail RRR & facsimile @ 212-314-0520)

Exhibit 4

 

**VIA FACSIMILE AND CERTIFIED MAIL**

Scott Felcher, Esq.
Felcher & Freifeld, LLP
358 Fifth Avenue
Suite 401
New York, NY 10001

December 4, 2007

RE:    **Mary J. Blige / "Work That" / Drama Family Entertainment, Inc.**

Dear Mr. Felcher:

We have received your letter dated December 4, 2007 with respect to your claim on behalf of Drama Family Entertainment, Inc. in connection with the composition entitled "Work That" as embedded on the upcoming album "Growing Pains" by Geffen Records' exclusive recording artist Mary J. Blige. Please be assured that we take all claims seriously. As such, we have forwarded your letter to the artist's representatives, since the artist is responsible for this claim. We suggest that you direct all future inquiries and correspondence to Mary J. Blige, c/o Sonya Guardo, 152 W. 57th Street, Carnegie Hall Tower, New York, NY 10019.

This letter is written without prejudice to the rights, claims and remedies of Geffen Records, all of which are hereby expressly reserved without limitation or exception.

Sincerely,

Craig S. Marshall

CM:al

cc:    Rand Hoffman
       Sonya Guardo

MJB.Felcher lttr.12.4.07



## FAX COVER PAGE

**DATE:** December 5, 2007

**TO:** Scott Felcher

**COMPANY:**

**RE:** Mary J. Blige / "Work That"

**FAX #:** (212) 695-4041

**FROM:** Craig S. Marshall

**PHONE #:** (310) 865-7622    FAX #: (310) 865-7904

**# OF PAGES (INCLUDING COVER SHEET): 2**

Please note: The information contained in this facsimile message is privileged and confidential and is intended only for the use of the individual named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please contact the sender or call (310) 865-7991. Interscope Geffen A&M Records, a division of UMG Recordings, Inc., 2220 Colorado Ave., Santa Monica, CA 90404.